BEN. BLANCHARD v. JOSEPH R. JACKSON *et al.**

1. OPTION CONTRACT—*Seller and Buyer—Action by Buyer— Findings--Evidence.* An option was obtained to purchase a body of land upon one of several plans. The cost of the land and the terms of payment were to be determined by the plan which the purchaser should elect to take. Small payments of money were to be made to secure the option, and, under the option agreement, it was provided that an election of plans should be made, a contract entered into, and payments made by the purchaser within a limited time, and that a failure to comply with the conditions of the option would forfeit the money paid and all rights under it. Only a portion of the money to secure the option was paid by the purchaser, and some improvements were made upon the land without authority, but no contract of purchase was made, and long after the time that the option expired the land was sold to another. In an action wherein the purchaser seeks specific performance or a recovery of damages, it was substantially held by the trial court, upon conflicting testimony, that the purchaser never elected upon which plan he would purchase the land, nor complied with the conditions of the option agreement; that no contract of purchase was ever made; and that he was not entitled to any relief. *Held,* Upon an examination of the record, that there is sufficient testimony to sustain the finding and judgment of the court.

2. FINDING, *When not Disturbed.* A general finding of a trial court, based upon conflicting testimony, will not be disturbed by the supreme court.

### *Error from Chase District Court.*

THIS action was brought in the district court of Finney county by Joseph R. Jackson to quiet title to several tracts of real estate in Finney county, amounting in the aggregate to about 10,000 acres, alleged to have been purchased by him from Ott & Tewksbury in August, 1886, who had obtained title from the Atchison, Topeka & Santa Fe Railroad Company, which company had derived the property through a

*NOTE.—Held pending motion for rehearing, which was overruled June 11, 1895.

grant from the United States.   Ben. Blanchard and
other parties who claimed an interest in the land were
made defendants, and the prayer of the petition was
that their claims of title or interest be adjudged null
and void, and the title to the premises quieted in
the plaintiff as against them.   Blanchard answered,
alleging a purchase of the land from the railroad
company in December, 1884, under which he took
possession of and made improvements upon the land
of the value of $20,000, and that the company had
knowledge that such improvements were being made.
He alleged that the purchase was made in the name
of M. A. Carpenter, although he was the real party in
interest, and that he paid to the company upon the
contract the sum of $4,000, to apply on the purchase-
price of the land; that Carpenter, in April, 1885, as-
signed his rights under the contract to Blanchard;
that this assignment was duly approved by the land
commissioner of the railroad company, and that under
the contract he was to pay the company $1.25 per
acre for a portion of the lands, and $1.50 per acre
for the remainder; that he built houses, dug wells
and broke lands upon the land, and by reason of these
improvements the lands were greatly enhanced in
value, and are worth $10 per acre; that in considera-
tion of the purchase-price and the making of said im-
provements, Blanchard was to have one year to pay
out on the land under his contract.   It is alleged that
Ott & Tewsbury knew of his possession and improve-
ments before their purchase of the land on May 25,
1886, and that Jackson knew or ought to have known
of his possession and claim of title.   He averred that
the railroad company had refused and neglected to
convey the lands to Blanchard, although he had offered
to pay the whole of the purchase-money, and that he

was now ready to pay all of said purchase-money upon receipt of the deeds for the land. He alleged that by reason of the failure of the company to keep its contract he was damaged in the sum of $150,000, and he asked for a decree adjudging him to be the equitable owner of all the land, and to a specific performance of the contract upon his paying the amount of the indebtedness due under his contract; and, second, that in case such judgment could not be rendered in his favor, he be awarded judgment against the company in the sum of $150,000. The railroad company filed an answer, containing a general denial, and further alleging that, in December, 1884, the company withdrew from the market, upon the application of one Holmes, 18 sections of land, upon condition that a deposit of $100 per section should be made, and was to hold the land for a term of 60 days, when Carpenter, for whom Holmes was acting, had the option to purchase the land upon any of the regular terms given by the company. Subsequently, and about December 18, the company agreed with Holmes to hold for his further advice and prompt remittance of $50 per section, as a deposit, the remainder of the lands; that on February 3, there was deposited with the company the sum of $2,000, $1,800 thereof being $100 per section in consideration of reserving 18 sections which lie north of the Arkansas river from sale for 30 days, and it was agreed that if Carpenter failed to make the further payment before the expiration of the time the deposit should be forfeited. The remaining $200 were to be applied as a part of the deposit of $50 per section on the balance of the lands which lie south of the river, it being stipulated that the remainder of the deposit on the latter land should be forthwith deposited in order to reserve the lands

and protect the option ; and it was agreed that if the residue of the deposit was not forthwith made the deposit should be forfeited.    It is alleged that no further payment was made on any of said lands, that the deposit was forfeited, and due notice thereof was given to the interested parties.    It is alleged that in the erection of houses and the making of improvements, Blanchard was a trespasser upon the said lands, and that the houses were mortgaged and conveyed by him by bill of sale to secure the indebtedness of Blanchard for the purchase-price of lumber and other materials used in the erection thereof, and that afterward said houses were sold at public auction to satisfy that debt, and Blanchard has wholly abandoned any possession of the land, if any he ever had.    It is further alleged in the answer of the company, which was verified, that Holmes, with whom Blanchard claimed to have made a contract, had no authority to make the contract alleged to have been made.    A change of venue was taken to the district court of Chase county, where, upon stipulation of the parties, a trial was had before the Hon. John Martin, sitting as judge *pro tem.*    A jury was waived, and upon the issues joined a general finding was made against Blanchard and in favor of Jackson, the railroad company and the other defendants in error.    Blanchard excepted to the findings and judgment subsequently rendered, and has brought the case up for review.

*James McKinstry, Samuel R. Hamill*, and *J. D. Mc-Farland*, for plaintiff in error.

*A. A. Hurd, Robert Dunlap*, and *C. N. Sterry*, for defendant in error, the A. T. & S. F. Rld. Co.

The opinion of the court was delivered by

JOHNSTON, J. : The lands purchased by Jackson, the title of which has been determined and quieted in this action, were part of a large grant formerly owned by the Atchison, Topeka & Santa Fe Railroad Company. To dispose of these lands the railroad company organized a land department, and placed a commissioner in charge who employed local, field, and foreign agents to assist him. Blanchard had been employed as an agent of the company, and was therefore familiar with the different terms and plans upon which the lands were sold by the company. A list of prices was fixed upon the lands, but they were disposed of upon several well-known plans, one of which was the cash plan, under which a purchaser paid cash and was allowed a large discount from the list price. Another was the three-year plan, where there was a smaller discount, one-third of the price paid down and the balance in two annual payments. Another was the six-year plan, under which a purchaser got a small discount, a small portion of the price was paid in cash and the balance in six annual installments. There was an eleven-year plan, under which there was but little discount and the payments were made in eleven annual installments. The company also made provision whereby a proposed purchaser might, upon the payment of $100 upon a section, withdraw such land from sale from 30 to 60 days, during which time the purchaser had the option to purchase the land at the list price under any of the plans of sale which have been mentioned ; but if he failed to exercise his option and make a purchase within the time limited the money advanced was forfeited to the company. It appears that the terms of this provision were sometimes

varied, and that the company at times reserved the land for a smaller amount per section than $100. Blanchard had taken several options upon railroad lands, and in some cases had succeeded in negotiating a sale of the lands reserved before the expiration of the option. In 1884 he had deposited money and obtained an option in the name of Wolf for a body of land, and having failed to purchase the same within the prescribed time, the reservation had been revoked and the money declared forfeited. About December 12, 1884, Blanchard went to Garden City, where he talked with Holmes & Co., who were the local agents at that place for the sale of the company's lands, about taking an option on the lands in controversy. The result of the talk was that he gave Holmes a check for $1,700 to reserve 17 sections of land, for which a receipt was given. On the next day a further conference was had between them, in which it was agreed that Holmes should go to Topeka and intercede with the land commissioner in behalf of Blanchard to set aside the forfeiture upon the Wolf land, and also to make a further arrangement by which 25 sections of the cheaper lands on the south of the river might be reserved upon the payment of $50 per section. In connection with this arrangement, and to assist in carrying it out, Blanchard gave Holmes an additional check for $8,375.68. There is little if any dispute between the parties as to the facts stated, but there is a sharp conflict in the testimony as to the terms of the options and the subsequent transactions between the parties. It is conceded that Holmes went to Topeka at the instance of Blanchard and secured a reinstatement of his Wolf option which had been forfeited, by using the $1,700 which had been advanced as a deposit to reserve a portion of the lands in controversy, and that he also induced the

land commissioner to withdraw these lands for a few days without a deposit, upon condition that a deposit of $100 per section on the lands north of the river and $50 per section for 25 sections of the lands south of the river should be forwarded on or before January 1, 1885. No money was paid to the commissioner with which to reserve the land until February 4, when Holmes made a deposit of $2,000, taking a receipt therefor, and this was the only writing which ever passed between the parties in regard to this option. As will appear, the reservation was taken by Blanchard in the name of M. A. Carpenter for a period of 30 days. The following is the document:

"TOPEKA, KAS., February 4, 1885.

"*Messrs. I. R. Holmes & Co., Garden City, Kas.:* DEAR SIRS — In reply to yours of ——, inclosing two thousand dollars as deposit for thirty days, account of M. A. Carpenter, on the following lands, [here follows description of 18 sections north of the river and 25 sections south of the river]. We await receipt of further advice and application. Yours truly,

A. S. JOHNSON, *Land Commissioner.*"

On May 29, 1885, the land commissioner notified Blanchard that the deposit had been forfeited because of non-compliance with its provisions. Blanchard asserts that on December 13, 1884, he entered into an agreement with Holmes by which he was to go to Topeka and arrange with the land commissioner to give him an option of one year from that time upon the lands, on condition that he would pay $100 per section for 18 sections and $50 per section for 25 sections, and the further arrangement that he would build some houses and make certain improvements upon the land, and that Holmes afterward notified him that such an arrangement had been made. He claims to have paid $3,200 under this agreement with which to re-

serve the land, and that subsequently, at considerable expense, he erected several houses and made other improvements upon the land. He further claims that once, in April, 1885, he arranged a sale of 30 sections to a man named Cole, and that a draft for $25,000 was actually sent to the land commissioner to pay for the land, but it appears that the letter transmitting the draft contained conditions which prevented its acceptance, and the draft was returned. On July 13, Blanchard says that he arranged a sale or transfer to one Crawford for 24 of the sections for $25,000, and a draft for that sum was actually forwarded to the commissioner, who responded that the amount forwarded was more than sufficient to pay for the lands described; that no more than $21,359.30 would be required, and an inquiry was made as to what should be done with the excess, $3,640.70. It appears that this information was not in keeping with the representations made by Blanchard to Crawford, and the latter telegraphed the commissioner to hold the draft until explanations were obtained. Afterward Crawford directed the return of the draft, and no other or further attempt was ever made by Blanchard to comply with the conditions of his option, nor were any further steps taken toward a purchase of the land. Holmes says that no more than $2,000 was ever paid upon the option, and positively denies that he made any agreement with reference to improvements, or that the option should be extended for a period of one year. It is conceded that he had no authority to make such a contract without obtaining the express consent of the commissioner, and it is further conceded that Blanchard knew at the time he paid the $2,000 to Holmes that Holmes had no such authority.

There is a large volume of testimony of the most

contradictory character, but there being no special findings, and the general finding of the court being against the plaintiff in error, all these disputes must be resolved against him.    There is much said in his brief respecting the weight of the testimony, which in this state of the case is unavailing.    We cannot weigh the testimony to determine the preponderance, nor go further than to inquire whether there is sufficient to sustain the general finding of the trial court.    The case might have been reviewed more satisfactorily if special findings of fact had been made, but without them we must infer that the general finding of the court includes in ·it every material fact, and that where there is some proper testimony to support every essential element of the general finding, a judgment based thereon cannot be disturbed by the supreme court.

1. Option contract—seller and buyer—action by buyer—findings—evidence.

(*Railroad Co. v. Foster,* 39 Kas. 329 ; *Mushrush v. Zarker*, 48 id. 382.)    In this view we must conclude that Blanchard did not at any time pay sufficient money to reserve the land for any period ; that no agreement was made that he might have an option for a year by reason of making certain improvements upon the land ; that he has not even complied with the terms of the option which he alleges was given to him ; that he has never purchased the land, nor elected under which one of the plans upon which it was offered for sale he would purchase it ; that he has never at any time paid or tendered the purchase-price of the land under any plan ; and that before the lands were sold by the company, he abandoned his option and surrendered any claim which he ever had to a right to purchase.    Blanchard asks a specific enforcement of a contract of purchase when no purchase has in fact been made.    During the limit of the option

he could select any one of four or five different methods under which the company sold its land, and such selection would fix the amount of the purchase-price and the terms of payment. Until that was done no one could know how much land was to be taken, nor the price to be paid, nor what would be the times of payment. The option agreement was binding on the parties, and might have been enforced at the instance of Blanchard if he had elected to purchase and had complied or offered compliance with the terms of the agreement within the stipulated time. (*Bras v. Sheffield*, 49 Kas. 702.) There was no such compliance, however, within the time fixed in the written option, nor yet within the year which Blanchard said was agreed upon.. It appears that Blanchard made several unsuccessful efforts to dispose of the land early in the year 1885, and although the time had elapsed, it seems that the commissioner was still willing to let him have the land on his option as late as July 15, 1885. Blanchard earnestly contends that the draft which was then forwarded by Crawford from Chicago entitled him to 24 of the sections included in the option. It appears, however, that the money was withdrawn before it could be applied, on account of misrepresentations made by Blanchard with regard to the cost of the land.

We fail to find anything in the testimony indicating a purpose on the part of the commissioner or other of the agents of the company to frustrate the efforts of Blanchard in disposing of the land within the specified time. Looking at the testimony of the defendant in error as we are required to do, it would seem that considerable indulgence and leniency had been shown to Blanchard in carrying options for him, even after some of the conditions had been broken.

After the Crawford transaction, in July, 1885, no effort was made by Blanchard to exercise his option or comply with any of its conditions. Indeed, it appears that soon afterward trouble arose which caused him to flee the country, and there is testimony that on his return, in December, 1885, he acknowledged that he had lost the lands in question, and made statements indicating an abandonment of his option. It is true that he made improvements on some of the lands, but the houses were soon sold and removed to satisfy claims and liens against them. They were placed on the land, as we must assume, without authority, and with a knowledge by Blanchard that he would lose them, as well as the deposit, in case he failed to exercise and protect his option. There is testimony that he was advised not to make any improvements upon the land because of the risk he would run of losing the deposit and improvements in case he was unable to make the purchase, but he insisted that he was positive that he would be financially able to close the deal, and was therefore willing to assume the risk.

Proof was offered that the land was vacant and unoccupied when it was sold to Jackson, and, as the testimony stands, Blanchard is not in a position to claim anything by reason of the improvements that were made upon the same. He failed to sustain the allegations of his cross-petition, and was therefore denied relief. Under the testimony and general finding, he had nothing more than an option, by which the cost of the land and terms of sale were to be determined upon election of one of the plans under which the land would be sold ; and, as no election was ever made, the price of the land and terms of payment were never determined. No contract of sale was ever made, and, as the parties have never settled upon what the contract

should be, the court certainly could not make and enforce one for them. Considerable testimony was offered by Blanchard to sustain his view, and much is said in his behalf about the overwhelming weight of evidence being in his favor ; but, as has been seen, his testimony is contradicted by that of the other parties, and the general finding of the court upon the conflicting testimony is conclusive here. That finding determines that Blanchard utterly failed to comply with the conditions of his option, and that he has forfeited all rights under it.

2. Finding, when not disturbed.

·There are some objections to rulings upon the admission of testimony, but we find nothing in them of a substantial character, or which require special comment.

The judgment of the district court will be affirmed.

All the Justices concurring.